**The Psychological Trauma Center**
a division of Preventive Psychiatry Associates Medical Group, Inc.

Medical Director: Gilbert W. Kliman, M. D.

2105 Divisadero St., San Francisco, CA 94115
Phone (415)292-7119   Fax (415) 749-2802
www.expertchildpsychiatry.com

*Forensic Child Psychiatric Evaluations, Life Care Plans & Testimony*

# DECLARATION OF GILBERT KLIMAN, M. D.

June 4, 2009

**RE: EXPECTATION OF HARM FROM DISCLOSING THE PLAINTIFFS' IDENTITIES IN DOES V JEFFREY EPSTEIN**

1. I, Gilbert W. Kliman, M.D., of 2105 Divisadero Street, San Francisco, California, CA. Physicians License G55912, declare the following under penalty of perjury:

2. I have been retained by plaintiffs' law firm, Mermelstein & Horowitz, to give expert testimony. If called as a witness, I would testify truthfully and competently concerning my psychiatric findings about each of the plaintiffs' alleged experiences of sexual abuse, and the enduring effects that I find each of the young women have suffered as a direct result of the sexual acts perpetrated by the defendant.

3. I have been asked to respond to the Defense motion, which requests that some of the plaintiffs, who are now adults, should be publicly named. It is my opinion that involuntary public disclosure will result in the plaintiffs experiencing revictimization, albeit by a justice system that is designed to protect them. If their identities are released, the victims will be at-risk of having their personal lives scrutinized by friends, extended family, spouses, children, fellow students, employers and fellow employees, the media and general public. This type of exposure humiliates many victims and represents another betrayal of trust. Public exposure places the plaintiffs at further risk of stigmatization, shame and retraumatization.

4. Due to traumatization the plaintiffs are arrested in their development, and even those who are now legally adults are arrested in part to adolescent aspects of psychology.

5. The plaintiffs do not hold their heads high with pride for having been sexually controlled by Mr. Epstein. They hold their heads low with shame. The internal life of a typical adolescent, into late adolescence and early adult years in the best of circumstances, usually involves generous proportions of self-consciousness, shame, self-absorption and self-doubt and self-blame about sexual acts.

**EXHIBIT "A"**

1

6. Clinically harmful levels of shame, self-consciousness, self-doubt and self-blame are even more prominent among victims of molestations than among the general population.

7. Molested teenagers are particularly vulnerable to wrongful manipulations and special clinical harms from the experiences of shame and humiliation. In fact, shame and efforts to cope with it played an underlying role in the harm to each plaintiff. Each was lured into Mr. Epstein's sexual lair with the promise of overcoming bodily and sexual shame by earning money and bettering their lot in life. The defendant capitalized on their sexual naiveté, insecurities and effort to better themselves, and he worked hard to overcome their shame at his enlistment of them in his selfish gratifications.

8. The defendant who wishes to make their identities public is one whom the criminal justice system has already determined is a person who has already committed a crime of child molestation. That surely means he has already exploited and manipulated the girls' state of adolescent sexuality, including their embarrassment, awkwardness and bodily self-consciousness. He perverted their nascent and developing moral structures by posing as a generous, avuncular mentor who could coach them about their bodies, sex and love.

The exploitation of adolescent bodies, sex and love is – from a psychoanalytic point of view – an influence on the developing moral conscience of the children, as well as on their sexual urges. Now the ravaging of their internal and private moral conscience is intended by the perpetrator to be made a public ravaging.

9. Among sexual trauma victims, the insidious and destructive persistence of shame, humiliation and associated self-blame is well-documented (Finkelhor and Brown, 1985). Stigmatization, as experienced by a sexual trauma victim, has especially painful and pathologic consequences. Shame lingers and becomes integrated within the adolescent victim's malleable emerging identity, character structure and self image. Moral clarity is distorted. Perceptions of self-blame and guilt are magnified. The impact of shame lends to cultivating a self image of being "spoiled goods."

10. Stigmatization following sexual trauma results in long-term risks that can negatively shape multiple facets of adult development: sexual, emotional, interpersonal and vocational. Stigmatization, which is generally to be avoided among psychiatric patients, increases risks among those – as in our plaintiffs as a group – who experience clinical depression and self-destructive behaviors: drug use, criminal activity, even prostitution.

Stigmatization following abuse is associated with delinquency due to increased anger and affiliation with deviant peers (Feiring et al., 2007).

11. Shame and guilt are important dimensions of both complex and single event, posttraumatic stress disorder (PTSD). Symptoms of shame are associated with feelings of helplessness and powerlessness, which each of the plaintiffs endorsed experiencing in relation to Mr. Epstein.

12. The DSM-IV-TR recognizes both powerlessness and helplessness as requisite parts of the traumatic experience in Criterion A for the diagnosis of posttraumatic stress disorder trauma (Martin Seligman, recent Past President of the American Psychological Association, coined relevant terms of "learned helplessness and "Loss of Personal Locus of Control." See Seligman, M.P. 1975: Helplessness, Depression, Development and Death. W. H. Freeman, San Francisco). The teenaged girls suffered the loss of personal locus of control to a much more experienced, sexually aggressive, powerful and dominant, manipulative perpetrator.

13. Releasing names of the plaintiffs to the public will reenact experiences of powerlessness and helplessness in the face of a boundary violation. Repetition and reenactment represent central features of Criterion B in the DSM-IV-TR diagnosis of posttraumatic stress disorder trauma. In effect, release of their identity and public intrusion into their personal life represents a reenactment of the shame of sexual traumatization. Repetition and reenactment are central pathologies that afflict sexual trauma survivors.

14. Victims of sexual abuse often rely upon some form of dissociation, splitting or denial, as a defensive means to manage overwhelming affects associated with the sexual trauma. Each of the plaintiff girls has employed some variation of this defense, both during the massages and then subsequently following disclosure of the abuse. Primitive, maladaptive responses of this nature will become additionally reinforced as a result of public disclosure.

15. Another aspect of the plaintiffs' experience, which is recognized by DSM-IV-TR, is that the trauma was associated with human design factors (such as cruel intention to do harm, rape, torture). Trauma of this origin has a tendency to produce more "severe or long lasting" posttraumatic stress disorder than natural events (DSM IV TR p. 464). A policy of deliberate revelation of the names of the victims would reinforce the sense of design, pattern and policy of human intentions.

16. Negative expectations about significant activities are noted in DSM-IV-TR, as part of Criterion C. Symptoms of foreshortened future are characteristic of a traumatized individual's clinical course (C4). They expect revictimization. They expect bad outcomes (C7) in their social, educational, vocational, relational plans. They are hypervigilant (Criterion D4) for further trauma, and this affects lifestyle choices and future planning. Hypervigilance is part of the arousal set of criteria. Public disclosure of the victims' identity will aggravate existing symptoms of hypervigilance.

17. The DSM-IV-TR diagnostic category of "chronic" is justified for each of the plaintiffs. Scientific literature shows that the prognostic consequences of PTSD and residual effects may last for decades (U.S. Dept. of Health, 2005; *Issues in Child Abuse Prevention Number 9 Autumn1998:* Long-term Effects of Child Sexual Abuse, Paul E Mullen and Jillian Fleming). The lasting impact upon character, identity and moral development will probably affect long-term influences upon adult development. It is more probable than not that stigmatization associated with public disclosure of the

plaintiffs' identities will intensify the scope, nature and severity of the chronic symptom course.

18. In addition to PTSD, shame and humiliation themselves have also been associated with causing clinical depression. Coexisting PTSD and clinical depression places the plaintiff's at increased risk for re-victimization and high risk sexual behaviors (e.g., sexually transmitted disease, premature pregnancy, rape) (Nelson, 2002), and at greater risk to victimize others (Filipas and Ullman, 2006; Desai, Centers for Disease Control, 2002) who are in their control. Studies have also shown that chronic symptoms of PTSD, in association with a single episode of Major Depressive Disorder, can produce lifetime adjustment difficulties, which include suicidality (Oquendo et al, 2005; Dube et al, CDC, 2001; Rohde, J. Am. Acad. Child and Adolescent Psychiatry 2005). The plaintiffs will be additionally vulnerable to these clinical outcomes, if they suffer the stigmatization and humiliation associated with public disclosure of their identities.

19. Alternative hypothesis: I have applied the evidence shown from examination and testing of the plaintiffs and relevant observations and information from other professionals while testing an alternative hypothesis: that no harm would result from public disclosure of the plaintiffs' identities. During the evaluations with the six plaintiffs, I used generally acceptable criteria for establishing whether a DSM-IV-TR disorder occurred. I established that there were provable and diagnosable injuries, primarily posttraumatic stress disorder and comorbid depression. Based upon these diagnostic signs, it is more probable than not, that exposing the plaintiff's identity to the public is not a trivial concern or one without substantial clinical repercussions. I believe that most child, adolescent and adult psychiatrists would share the opinion that additional psychiatric injury will result from such exposure.

20. However, consider for the sake of argument, that my diagnostic conclusions are incorrect, notwithstanding having fulfilled standard psychiatric evaluation procedures of taking a history from multiple sources, videotaping and transcribing my initial interview, and reviewing available medical and legal documents. Even if this was the case, and my diagnostic conclusions were faulty, I believe that multiple experts, even those who may now propose publication of the victims' names, would still come to a conclusion that the plaintiff's suffered sexual abuse, and in some cases, multiple acts of ongoing abuse, at the hands of Jeffery Epstein. Even without developing a subsequent disorder, there is much clinical evidence and scientific literature showing likelihood of substantial psychiatric harm to these sexually abused plaintiffs.

21. To form these conclusions, I have used my extensive experience in forming these opinions. That experience is both as a treating child psychiatrist and separately as a forensic psychiatrist. I have treated hundreds of minor patients, as well as additionally evaluated hundreds of children and adolescents who have suffered sexual abuse. I have made long term followups of many of the children and have treated many adults who have been molested as adolescents. It is my opinion, with a reasonably high degree of medical certainty that the defense motion to allow public disclosure of the plaintiffs' identities is clinically and ethically a wrongful plan. The act of revealing their identities against their wishes places the plaintiffs at risk, in the best of circumstances, of suffering

an aggravation of existing diagnostic concerns. It is more probable than not that releasing personal identities will foster an exacerbation and magnification of symptoms lending to increased risk of revictimization and retraumatization.

I declare under penalty of perjury under the laws of the State of California that the foregoing statements are true and correct, and that this declaration was executed at San Francisco, California on June 4, 2009.

Sincerely,

*[signature]*

Gilbert Kliman, M.D.
Distinguished Life Fellow, American Psychiatric Association
Senior Fellow, American Academy of Child and Adolescent Psychiatry
Dean Brockman Award Holder, for Distinguished Lifetime Contributions to Psychoanalysis and Psychiatry, bestowed by the American College of Psychoanalysis and Psychiatry

*[Notary seal: LEONID NAKHODKIN, COMM. # 1791115, NOTARY PUBLIC - CALIFORNIA, CITY & COUNTY OF SAN FRANCISCO, MY COMM. EXP. FEB: 27, 2012]*

State of California, City & County of San Francisco
Subscribed and sworn to (or affirmed) before me on this 4 day of June 2009, by Gilbert Klimeen proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

*[signature]*
Leonid Nakhodkin